1  Lois M. Kempff
2  25231 Del Rio
   Laguna Niguel, CA 92677
3  (949) 249-3432 home
4  Pro Se

5

6

7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10 | LOIS M. KEMPFF,                          | Case No.  SACV10-01635 JVS (RZx)

11 |          Plaintiff,                       | I AM LOIS M. KEMPFF, ONE OF THE PEOPLE
                                               OF CALIFORNIA, AND IN THIS CASE
12 | v.                                        | COMPLAIN AGAINST DEFENDANTS FOR
                                               DAMAGES FOR FRAUD ON ASSIGNMENT,
13 | MORTGAGE ELECTRONIC                       | BREACH OF CONTRACT, INTENTIONAL
     REGISTRATION SYSTEM (MERS) (R.            INTERFERENCE WITH ADVANTAGE AND
14 | K. Arnold President & CEO),  INDYMAC      | BREACH OF CHAIN OF TITLE
     (Richard H. Wohl President), ONEWEST
15 | BANK (Terry Laughlin President),
     DEUTCHE BANK NATIONAL
16 | TRUST COMPANY (Dr. Josef
     Ackerman Chairman of the
17 | Group Executive Committee),
     QUALITY LOAN SERVICE CORP.
18 | (Kevin R. McCarthy
     President)
19 |          Defendants,
20

21 PLAINTIFF Lois M.  Kempff sues defendants MERS, IndyMac-OneWest Bank, FSB, Deutche

22 Bank National Trust Company, Quality Loan Servicing Corp for money damages and property and

23 states:

24                              **JURISDICTION**

25 1.  This is an action for money damages in excess of $75,000.

26 2.  This is an action seeking Clear Title to property known as 25231 Del Rio,

27 Laguna Niguel, County of Orange, California, Assessor's Parcel Number 637-155-09,

28

Lot 80 of Tract 4903, as per map recorded in Book 295, Pages 45 to 48 Inclusive of Miscellaneous

Maps in the Office of the County Recorder of said County.  Grant Deed number 298984-11 227-2-4.

(Exhibit A)

3.  At all times material to this lawsuit, Lois May Kempff was a resident of Orange County,

California.

4.  This is a case involving RICO, Fed. R. Civ. P. 23 making a claim for treble and punitive damages,

costs and attorneys fees under 18 U.S.C. 1962 and 1964, otherwise known as the "racketeer influenced

and corrupt organizations act," herinafter "RICO"and for all violations of law heretofore claimed.

5.  Venue is proper in this Judicial District because the Defendants have conducted business, albeit

illegally, in this County and throughout the counties of California and throughout the United States by

filing tens of thousands of fabricated, illegal and unenforceable Promissory Notes, Assignments of

Promissory Notes, Affidavits as to loan ownership and Status of Accounts, Mortgages and

Assignments of Mortgages.

6.  This Court has jurisdiction.

## GENERAL FACTUAL ALLEGATIONS

7. On September 24, 2010, Members of Congress, Alan Grayson, Barney Frank and Corrine Brown

wrote an open letter to Mr. Michael J. Williams, President and CEO of Fannie Mae, as to the

egregious nature and Congressional hearings as to the issues which are the subject of this action.

8.  The legality of MERS on Deeds of Trust is being litigated in a Consolidated Class Action, *In Re*

*MERS Litigation*, MDL 2119, United States District Court Arizona.

9.  I have standing to sue as I possess the same interest and have suffered or will suffer in the future,

the same type of injury as the putative class members and defendants to a foreclosure action relating to

the property wherein a Mortgage was or is recorded in the name of MERS against the property.

10. On April 11, 2002 the Plaintiff moved into the property (known as 25231 Del Rio, Laguna

Niguel, California) which was abandoned at the time, and Plaintiff has been living there peacefully

ever since.

11.  Down payment totaled approximately $43,300.00.

12. Monthly payments of between $3,100.00 and $2,300.00 have been made on mortgage from April 2002 until November 2008.

13. On January 19, 2006 Juergen Kempff and Lois M. Kempff, husband and wife, entered into an agreement with IndyMac to refinance the debt for a better interest rate.

14. Monthly payments have been made on current agreement totaling approximately $70,000.00, together with proof of Plaintiff's credit in good standing before discovery of forgeries. (Exhibit B)

15. In a letter dated December 19, 2008, IndyMac informed The Kempff's of a monthly payment change from $2557.25 to $4303.28. (Exhibit C)

16. In a package dated July 24, 2009, Plaintiff sent request to IndyMac to validate the debt. (Exhibit D)

17.  In a package dated August 6, 2009, IndyMac sent Plaintiff a copy of the contract dated January 19, 2006.

18. Said package dated August 6, 2009 included one letter and two Federal Truth in Lending pages with four forgeries. (Exhibit E, copies attached with real signatures for comparison)

19.  Plaintiff has one year from discovery to complain of TILA violation.

20. On August 26, 2009, plaintiff complained by filing police report on the forged Truth in Lending documents. (Exhibit F)

21. IndyMac has not validated the debt originating on January 19, 2006.

22.  IndyMac can not validate the debt originating on January 19, 2006.

23. IndyMac, OneWest Bank FSB has not established its right to collect on said contract.  Since IndyMac does not hold the Note, it is not a party of interest and therefore, can not require Plaintiff to pay it.

24.  Quality Loan Service Corp has not established its right to foreclose on said property. (Exhibit G)

Quality Loan does not hold the Note, it is not a party of interest and therefore, can not move to sell Plaintiff's property. (Exhibit G)

25. MERS has not established its right to substitute Trustees on said property.  Since MERS does not hold the Note, it is not a party of interest and therefore, can not substitute Trustees nor split, bundle, and sell as a security on Wall Street.

## COUNT ONE: FRAUD ON ASSIGNMENT

26. Plaintiff realleges and restates the foregoing jurisdictional allegations and general factual allegations.

27. Plaintiff seeks a preliminary injunction to stop all harassment, collection attempt(s), foreclosure(s), sale(s) and/or otherwise unlawful taking of property from Plaintiff.

28. Mortgage Electronic Registration System (MERS) was used by IndyMac, OneWest Bank, FSB to record the Title of said property known as 25231 Del Rio, Laguna Niguel, California.

29. At the time a foreclosure was filed, the Kempffs believed they were in the process of a loan modification with IndyMac-OneWest Bank, FSB.

30. The Plaintiff was fraudulently led to believe that IndyMac, One West Bank, FSB was the owner of the loan.

31. The owner of the Plaintiff's loan remains unknown.

32.  Defendant Merscorp, Inc.(MERS), is a foreign corporation created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing principles of real property law, such as the requirement that any person or entity who seeks to foreclose upon a parcel of real property: 1) be in possession of the original note, 2) have a publicly recorded mortgage in the name of the party for whom the underlying debt is actually owed and who is the holder of the original Promissory Note with legally binding assignments, and 3) possess a written assignment giving he, she or it actual rights to the payments due from the

borrower pursuant to both the mortgage and note.

33. Defendant Merscorp, Inc., claims to be the sole shareholder in an entity by the name of Mortgage Electronic Registrations Systems, Inc., (MERS).  MERS is the RICO enterprise and is the primary innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this complaint.

34. For the purposes of this action, MERS shall also refer to each and every shareholder of MER SCORP, who will be named as their identities are revealed.

35. The complaint names the entity, Mortgage Electronic Registration Systems, Inc., hereinafter, (MERS). MERS is the recording system for the Plaintiff's mortgage. The original lender to the refi nance of January 2006 is Stearns Lending.

36.  Stearns Lending subsequently sold the debt to IndyMac, who recorded it again with MERS.

37. IndyMac OneWest Bank, FSB is no longer the holder of the debt, but is currently the servicer of the debt and as such has no legal standing to foreclose on the property.

38. MERS is not the original lender for the debt.  MERS is not the creditor, beneficiary of the underlying debt or an assignee under the terms of the Promissory Note of the Plaintiff.

39.MERS, is owned by the company, MERSCORP, which is in turn owned by a group of Wall Street investment Banks.

40. MERS is unregistered and unlicensed to conduct mortgage lending or any other type of business in the State of California and has been and continues to knowingly and intentionally illegally and fraudulently record mortgages and conduct business in California on a large scale and systematic fashion.

41.No promissory note or other evidence exists which could ever make the Plaintiff indebted to MERS in any way.

42. MERS never had nor will it ever have standing to enforce the illegal and fraudulent mortgage it filed against the property in question.  MERS never had nor will it ever have the authority to assign

the mortgage to any entity.

43. MERS has never possessed a pecuniary or financial interest in the Note of the Plaintiff.

44. MERS has never had any right to collect on the Note or enforce the Mortgage, nor has it had a right to hold, enforce or collect upon any of the thousands of Mortgages it has fraudulently recorded throughout the State of California, in the 50 states, the District of Columbia and all other US Territories.

46. In or about the last decade, the Defendant Firms joined with Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained. The employees of the Defendant Firms, including many licensed attorneys, have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to accomplish illegal acts.

47. Quality Loan Service Corp. is a foreclosure mill debt collector acting as an agent for MERS with its principle place of business in San Diego, California. (Exhibit H)

48. MERS is not a party of interest and has not established its right to appoint Quality Loan Service Corp. as Trustee for the Plaintiff.

49. Quality Loan Service Corp. has not represented Plaintiff fairly nor has it established its right to foreclosure on the Plaintiff's property known as 25231 Del Rio, Laguna Niguel, California.

50. IndyMac, OneWest Bank, FSB is a loan servicing company with its principle place of business in Kalamazoo, Michigan.

51. MERS is an electronic recording system and as such unlawfully assigned itself as the Beneficiary and unlawfully assigned Deed of Trust to IndyMac Federal Bank FSB. (Exhibit I)

52. MERS is an electronic recording system and as such unlawfully assigned Deed of Trust to OneWest Bank FSB. (Exhibit I)

53. MERS is an electronic recording system and as such unlawfully assigned Deed of Trust to Deutche Bank National Trust Company. (Exhibit I)

54. MERS automated system unlawfully securitized the Plaintiff's debt with the express purpose of making a profit without the consent of the Plaintiff.

55. MERS is an electronic recording system and as such has no legal standing to appoint a new Trustee.

56. MERS is an electronic recording system and as such has no legal standing to change the assignee on the Deed of Trust.

Wherefore, Plaintiff demands judgment for MERS' unlawful movement on Plaintiff's behalf where MERS has broken the clear chain of Title by appointing multiple Trustees, and by selling multiple packages of fractionalized mortgage as securitized debt.  Plaintiff seeks award of Clear Title on said property, together with such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT TWO: BREACH OF CONTRACT

57. Plaintiff re-alleges and restates the foregoing jurisdictional allegations and general factual allegations.

58. Plaintiff seeks a preliminary injunction to stop all harassment, collection attempt(s), foreclosure(s), sale(s) and/or otherwise unlawful taking of property from Plaintiff.

59. IndyMac holds contract with signatures not belonging to Plaintiff; therefore, Plaintiff noticed IndyMac in letter dated December 30, 2009. (Exhibit J)

60.  IndyMac holds contract with signatures not belonging to husband of Plaintiff.

61. Plaintiff paid monthly on said contract until notice of increase in payment from $2500.00 to $4300.00 alerted Plaintiff to problems with the contract.

62. IndyMac holds forged contract.

63. Plaintiff notified IndyMac of forgeries and police report.

64. Plaintiff's debt on mortgage is invalid.

Wherefore Plaintiff seeks all money paid on fraudulent mortgage be returned, and further demands

Judgment for willful negligence on forged debt against IndyMac, together with such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT THREE: INTENTIONAL INTERFERENCE WITH ADVANTAGE

65. Plaintiff re-alleges and restates the foregoing jurisdictional allegations and general factual allegations.

66. In letter dated December 30, 2009 Plaintiff informs Defendant of forgeries on the Federal Truth in Lending documents. (Exhibit J)

67. In letter dated February 11, 2010 Defendant acknowledges receipt of Identity Theft Claim Package from Plaintiff. (Exhibit J)

68. In letter dated February 25, 2010 Defendant writes: "The investigation has concluded that we are unable to confirm your claim of fraud." (Exhibit J)

69. In letter dated March 12, 2010 Defendant writes: "This letter is confirmation that IndyMac is still in the process of researching your identity theft claim." (Exhibit J)

70. In letter dated April 23, 2010 Defendant writes: "The investigation has concluded that we are unable to confirm your claim of fraud." (Exhibit J)

71. A Note is evidence of a loan.

72.  A Note with forgeries is invalid.

73.  No check or monies were ever given to Plaintiff.

74. Plaintiff owes no debt on said property.

Wherefore the contract between the Plaintiff and IndyMac is invalid, and IndyMac intentionally denied Plaintiff's petition for advantage, Plaintiff prays for an Order awarding nullification of said contract, release of collateral, and awarding of Clear Title on said property to Plaintiff.

75. Wherefore, possession is nine tenths of the law, and the Kempff family took peaceful possession of the abandoned property known as 25231 Del Rio, Laguna Niguel, California on April 11, 2002, Title, therefore, is one tenth of the law.  Plaintiff seeks to ascertain the whereabouts of the Title, and to lay claim to said Title lawfully.  Quality Loan Service Corp must establish its right to foreclose on

said property. IndyMac, OneWest Bank must establish its right to collect on a debt it does not own and did not fund with actual money. MERS must establish its right to split, bundle, and securitize for profit said property. MERS must also establish its right to appoint Trustees. There are TILA and RICO violations in the establishment of the mortgage. Therefore, Plaintiff demands this Court award Clear Title of the Del Rio property to Lois M. Kempff as lawful owner and occupier of said property together with such other further relief as the Court may deem reasonable and just under the circumstance. This is a winnable case. The Plaintiff is not a part of any class action suit.

76. Justifiable reliance is that the average home buyer depends on the expertise of the bank representatives in properly explaining and executing the documents required in the purchase of property. The average home buyer can not be required to understand the laws involved; however, she relies on the highly trained experts at the lending companies and trusts that they have filled and filed all paperwork legally. She now knows that this trust was misplaced and that the lending companies, the title companies and the recording companies have "dirty hands" or incompetence in their systemic dealings with homebuyers. U.S. Legal definitions describes justifiable reliance as follows: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." The lenders failed to provide the Plaintiff with justifiable reliance. Justifiable reliance upon a misrepresentation constitutes a critical requirement for strict liability under, P. 402B Restat 2d of Torts. Unless the misrepresentation of a particular fact i.e. failure to disclose interest rate changes, forged signatures, misrepresentation of MERS as beneficiary, misrepresentation of MERS as able to substitute Trustees, reasonably influences the purchase.

## **Supporting Argumentation**

77. Find the current mortgage situation explained by Ellen Hodgson Brown, J.D. below.

"The new Financial Stability Oversight Council (FSOC) probably didn't expect to have its authority called on quite so soon, but Rep. Alan Grayson (D-FL) has just put the Kanjorski amendment to the test. The amendment provides that federal regulators can preemptively break up large financial institutions that -- for any reason -- pose a threat to U.S. financial or economic stability. On October 7, in a letter addressed to Timothy Geithner, Shiela Bair, Ben Bernanke, Mary Schapiro, John Walsh (Acting Comptroller of the Currency), Gary Gensler, Ed DeMarco (FHA) and Debbie Matz (National Credit Union Administration), he asked for an emergency task force on foreclosure fraud. He said: "The liability here for the major banks is potentially enormous, and can lead to a systemic risk."

78. Senator Grayson sought a foreclosure moratorium on all mortgages originated and securitized between 2005-2008, until such time as the FSOC task force was able to understand and mitigate the systemic risk posed by the foreclosure fraud crisis. He wrote:

"The banks didn't keep good records, and there is good reason to believe *in many if not virtually all cases during this period, failed to transfer the notes*, which is the borrower IOUs in accordance with the requirements of their own pooling and servicing agreements. As a result, the notes may be put out of eligibility for the trust under New York law, which governs these securitizations. Potential cures for the note may, according to certain legal experts, be contrary to IRS rules governing REMICs. As a result, loan servicers and trusts simply lack standing to foreclose. The remedy has been foreclosure fraud, including the widespread fabrication of documents."

79. There are now trillions of dollars of securitizations of these loans in the hands of investors. The trusts holding these loans are in a legal gray area, as *the mortgage titles were never officially transferred to the trusts*. The result of this is foreclosure fraud on a massive scale. [Emphasis added.]

**80**. That raises the question, why were the notes not assigned to the trusts? Senator Grayson says the banks were not interested in repayment; they were just churning loans as fast as they could in order to generate fees. Karl Denninger says, "I believe a big part of why it was not done is that if it had been done the original paperwork would have been available to the trustee and ultimately the MBS

owners, who would have immediately discovered that the representations and warranties as to the quality of the conveyed paper were being wantonly violated." He says, "You can't audit what you don't have."

81. Both are probably right, yet these explanations seem insufficient. If it were just a matter of negligence or covering up dubious collateral, surely *some* of the assignments by *some* of the banks would have been done properly. Why would they all be defective?

82. The reason the mortgage notes were never assigned may be that *there was no party legally capable of accepting the assignments*. Securitization was originally set up as a tax dodge; and to qualify for the tax exemption, the conduits between the original lender and the investors could own nothing. The conduits are "special purpose vehicles" set up by the banks, a form of Mortgage Backed Security called REMICs (Real Estate Mortgage Investment Conduits). They hold commercial and residential mortgages in trust for the investors. They don't own them; they are just trustees.

83. In a similar case:

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

NATACHE D. RINEGARD-GUIRMA, Civil Case No. 10-1065-PK

v.

BANK OF AMERICA, NATIONAL ASSOCIATION
AS SUCCESSOR BY MERGER TO LA SALLE BANK
NATIONAL ASSOCIATION, AS TRUSTEE UNDER
THE POOLING AND SERVICING AGREEMENT
DATED AS OF AUGUST 1, 2006, GSAMP TRUST
2006-HE5, MERS, LITTON LOAN SERVICING LP,
and the ORIGINAL AND PURPORTED SUCCESSOR
TRUSTEES, LSI TITLE COMPANY OF OREGON, LLC,
AND QUALITY LOAN SERVICING CORPORATION
OF WASHINGTON,

84. Excerpts: On April 15, 2008, at 4:56 a.m., Marti Noriega, acting as Vice President for "Mortgage Electronic Registration Systems, Inc as nominee in favor of Mortgage Lenders Network USA, Inc." signed an assignment of the Deed of Trust to LaSalle Bank National Association, as trustee under the Pooling and Servicing Agreement dated as of August 1, 2006, GSAMP Trust 2006-HE5 ("LaSalle Bank National Association"). The assignment was recorded on April 29, 2008. On April 21, 2008, LaSalle Bank National Association, acting through Litton Loan Servicing LP as attorney in fact, appointed LSI Title Company of Oregon, LLC as successor trustee.

85. The Court, however, is aware of contrary authority. In In re Allman, a case from the United States Bankruptcy Court for the District of Oregon, the court described MERS as "more akin to that of a straw man than to a party possessing all the rights given a buyer." Bankr. No. 08-31282-elp7, 2010 WL 3366405, at *10 (Bankr. D. Or. Aug. 24, 2010) (quoting Landmark Nat'l Bank, 289 Kan. At 539). The court considered the meaning of "beneficiary" under Oregon's trust deed statute as "the person named or otherwise designated in a trust deed as the person for whose benefit the trust deed is given . . . ." ORS 86.705(1). The court then concluded, after examining language of the trust deed that is almost identical to the language contained in the Deed of Trust here, that MERS was not "in any real sense of the word, particularly as defined in ORS 86.705(1), the beneficiary of the trust deed." Id. Instead, MERS was a nominee and the trust deed was for the benefit of the lender.

86. Additionally, other courts have held that MERS does not have authority to transfer the note, even though it has authority to transfer the trust deed. Those courts have noted that when the note and deed of trust are split, the transfer of the deed of trust is ineffective. Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619, 623-24 (Mo. Ct. App. 2009) (in spite of deed language purporting to transfer the promissory note, MERS never held the note and the lender never gave MERS the authority to transfer the note; thus MERS' transfer of the deed of trust, separate from

the note, was ineffective and the successor lender lacked a legally cognizable interest in the

property); Saxon Mortg. Serv., Inc. v. Hillery, No. C-08-4357 EMC, 2008 WL 5170180, at *5 (N.D.

Cal. Dec. 9, 2008) (same as Bellistri); In re Wilhelm, 407 B.R. 392 (Bankr. D. Idaho 2009)

(successor lender had no standing to seek relief from bankruptcy stay and move forward with

foreclosure because MERS had no authority to transfer the note).

87. Oregon cases support the notion that the security, here the Deed of Trust, is "<u>merely an incident</u>

<u>to the debt.</u>" West v. White, 307 Or. 296, 300, 766 P.2d 383 (1988); see also U.S. Nat'l Bank of

Portland v. Holton, 99 Or. 419, 428, 195 P. 823 (1921) ("<u>The assignment of a mortgage, independent</u>

<u>of the debt which it is given to secure, is an unmeaning ceremony.</u>"). Federal courts are bound by

pronouncements of the state's highest court on applicable state law. If the state's highest court has

not decided an issue, and there is no relevant precedent from an intermediate appellate court, the

federal court is to predict how the state high court would resolve it. "In assessing how a state's

highest court would resolve a state law question– absent controlling state authority–federal courts

look to existing state law without predicting potential changes in that law." Ticknor v. Choice Hotels

International, Inc., 265 F.3d 931, 939 (9th Cir. 2001); see also Ryman v. Sears, Roebuck & Co., 505

F.3d 993, 994 (9th Cir. 2007).

88. Absent a decision from the Oregon Supreme Court or the Oregon Court of Appeals, and absent

further briefing from the parties on this specific issue, I am at least initially persuaded that

Rinegard-Guirma has a likelihood of success on the merits.

89. **As for irreparable harm, loss of a home is a grievous injury.**

90. **CONCLUSION**: For the foregoing reasons, **Rinegard-Guirma's Motion for a Temporary Re**

**straining Order and Preliminary Injunction (#18) is GRANTED**. The defendants are enjoined

from foreclosing Rinegard-Guirma's property described as: Lot 2, Block 16, Highland Park, in the

City of Portland, County of Multnomah and State of Oregon, Assessor's Parcel Number R180361,

Commonly known as 5731 NE 10th Ave., Portland, OR 97211 until the claims against MERS are

resolved.

91. IT IS SO ORDERED.

Dated this 6th day of October, 2010.
/s/ Garr M. King
Garr M. King
United States District Judge

92. In another related case:

The problem was nailed in a class action lawsuit recently filed in Kentucky, titled Foster v. MERS.

GMAC, et al. (USDC, Western District of Kentucky). The suit claims that MERS and the banks

violated the Racketeer Influenced and Corrupt Organizations Act, a law originally passed to pursue

organized crime. Bloomberg quotes Heather Boone McKeever, a Lexington, Kentucky-based lawyer

for the homeowners, who said in a phone interview, **"RICO comes in because the fraud didn't just**

**happen piecemeal. This is organized crime by people in suits, but it is still organized crime.**

**They created a very thorough plan."**

93. The complaint alleges:

The "Trusts" coming to Court are actually Mortgage Backed Securities ("MBS"). The Servicers, like

GMAC, are merely administrative entities which collect the mortgage payments and escrow funds.

The MBS have signed themselves up under oath with the Securities and Exchange Commission

("SEC,") and the Internal Revenue Service ("IRS,") as mortgage asset "pass through" entities wherein

*they can never own the mortgage loan assets in the MBS*. This allows them to qualify as a Real Estate

Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust

("REIT"). *As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS*. For

purposes of this action, "Trust" and MBS are interchangeable. . . .

94. **REMICS were newly invented in 1987 as a tax avoidance measure by Investment Banks. To file as a REMIC, and in order to avoid one hundred percent (100%) taxation by the IRS** and the Kentucky Revenue Cabinet, an MBS REMIC could not engage in any prohibited action. *The "Trustee" can not own the assets of the REMIC. A REMIC Trustee could never claim it owned a mortgage loan. Hence, it can never be the owner of a mortgage loan.*

95. Additionally, and **important to the issues presented with this particular action**, is the fact that in order to keep its tax status and to fund the "Trust" and legally collect money from investors, who bought into the REMIC, the "Trustee" or the more properly named, Custodian of the REMIC, had to have possession of ALL the original blue ink Promissory Notes and original alonges and assignments of the Notes, showing a complete paper chain of title.

96. Most importantly for this action, *the "Trustee"/Custodian MUST have the mortgages recorded in the investors name as the beneficiaries of a MBS in the year the MBS "closed."* [Emphasis added.]

97. Only the beneficiaries - the investors who advanced the funds - can claim "ownership." And *the mortgages had to have been recorded in the name of the beneficiaries the year the MBS closed.* The problem is, who ARE the beneficiaries who advanced the funds? In the securitization market, they come and go. Properties get sold and resold daily. They can be sliced up and sold to multiple investors at the same time. Which investors could be said to have put up the money for a *particular* home that goes into foreclosure? MBS are divided into "tranches" according to level of risk, typically from AAA to BBB. The BBB investors take the first losses, on up to the AAAs. But when the REMIC is set up, no one knows which homes will default first. The losses are taken collectively by the pool as they hit; the BBBs simply don't get paid. But the "pool" is the trust; and to qualify as a REMIC trust, it can own nothing.

98. **The lenders were trying to have it both ways; and to conceal what was going on, they dropped an electronic curtain over their sleight of hand, called Mortgage Electronic Registration Systems or "MERS**." MERS is simply an electronic data base. On its website and in assorted

court pleadings, **it too declares that it owns nothing**. It was set up that way so that it would be "bankruptcy-remote." Something required by the credit rating agencies in order to turn the mortgages passing through it in highly rated securities that could be sold to investors. According to the MERS website, it was also set up that way to save on recording fees, which means dodging state statutes re quiring a fee to be paid to establish a formal record each time title changes hands.

99. The arrangement satisfied the ratings agencies, but it has not satisfied the courts. **Real estate law dating back hundreds of years requires that to foreclose on real property, the foreclosing party must produce signed documentation establishing a chain of title to the property; and that has not been done. Increasingly, judges are holding that if MERS owns nothing, it cannot foreclose, and it cannot convey title by assignment so that the trustee for the investors can foreclose. MERS breaks the chain of title so that *no one* has standing to foreclose.**

100. Sixty-two million mortgages are now held in the name of MERS, a ploy that the banks have realized won't work; so Plan B has been to try to fabricate documents to cure the defect. Enter the **RoboSigning crew, who signed hundreds of documents a day without knowing what was in them. Interestingly, it wasn't just one bank engaging in this pattern of cover up and fraud but many banks, suggesting the sort of "organized crime" that would qualify under the RICO stat ute.**

101. However, that ploy won't work either, because it's too late to assign properties to trusts that have already been set up without violating the tax code for REMICs, and the trusts themselves aren't allowed to own anything under the tax code. If the trusts violate the tax laws, the banks setting them up will owe millions of dollars in back taxes. Whether the banks are out the real estate or the taxes, they could well be looking at insolvency, posing the sort of serious systemic risk that would bring them under the purview of the new Financial Stability Oversight Council."

102. A recent court decision came down in California on May 20, 2010 in a bankruptcy case called *In re Walker*, **Case no. 10-21656-E-11**. The court held that MERS could not foreclose because it was a mere nominee; and that as a result, plaintiff Citibank could not collect on its claim. The judge (Ronald H. Sargis) opined: **"Since no evidence of MERS' ownership of the underlying note has been offered, and other courts have concluded that MERS does not own the underlying notes, this court is convinced that MERS had no interest it could transfer to Citibank. Since MERS did not own the underlying note, it could not transfer the beneficial interest of the Deed of Trust to another. Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void under California law."** In support, the judge cited *In Re Vargas* (California Bankruptcy Court); *Landmark v. Kesler* (Kansas Supreme Court); *LaSalle Bank v. Lamy* (New York case); and *In Re Foreclosure Cases* (the "Boyko" decision from Ohio Federal Court). "Since the claimant, Citibank, has not established that it is the owner of the promissory note secured by the trust deed, Citibank is unable to assert a claim for payment in this case."

103. The broad impact the case could have on California foreclosures is suggested by attorney Jeff Barnes, who writes: "This opinion . . . serves as a legal basis to challenge any foreclosure in California based on a MERS assignment; to seek to void any MERS assignment of the Deed of Trust or the note to a third party for purposes of foreclosure; and should be sufficient for a borrower to not only obtain a TRO against a Trustee's Sale, but also a Preliminary Injunction barring any sale pending any litigation filed by the borrower challenging a foreclosure based on a MERS assignment."

104. MERS is not the title holder; therefore, it has no legal standing to foreclose or appoint foreclosure mills, nor does it have the legal standing to assign trustees. According to MERS own web site, MERS is, "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." It, therefore, exists for the purpose of circumventing assignments and documenting

ownership.

105. As alleged in a Nevada class action called **Lopez vs. Executive Trustee Services, et al**: "Before MERS, it would not have been possible for mortgages with no market value…to be sold at a profit or collateralized and sold as mortgage-backed securities.  Before MERS, it would not have been possible for the Defendant banks and AIG to conceal from government regulators the extent of risk of financial losses those entities faced from the predatory origination of residential loans and the fraudulent re-sale and securitization of those otherwise non-marketable loans.  Before MERS, the actual beneficiary of every Deed of Trust on every parcel in the United States and the State of Nevada could be readily ascertained by merely reviewing the public records at the local recorder's office where documents reflecting any ownership interest in real property are kept… After MERS, … the servicing rights were transferred after the origination of the loan to an entity so large that communication with the servicer became difficult if not impossible…. The servicer was interested in only one thing – making a profit from the foreclosure of the borrower's residence – so that the entire predatory cycle of fraudulent origination, resale, and securitization of yet another predatory loan could occur again. <u>This is the legacy of MERS, and the entire scheme was predicated upon the fraudulent designation of MERS as the 'beneficiary' under millions of deeds of trust…</u>"

106. This is a winnable case because the Plaintiff will prove that the Defendants knowingly defrauded their investors, they knowingly defrauded the home owners, they are involved in tax evasion, and filing fees evasion.

107. "If the American People allow private banks to control the issuance of the currency, first by inflation and then by deflation, the banks and corporations that will grow up around them will deprive the People of all their Property until their Children will wake up homeless on the continent their Fathers conquered." Thomas Jefferson



Respectfully submitted this _25th_ day of _October_, 2010.

LOIS M. KEMPFF
Plaintiff in Pro Se:

_Lois M. Kempff_

**PROOF OF SERVICE**

1

2

3    I, _Diane L. Jenkins_ (name), declare as follows.  I am over the

4    age of 18 years. My address is:

5    _Diane L. Jenkins_

6    _25096 Nueva Vista_

7    _Laguna Niguel, CA 92677_

8

9    On _October 25, 2010_ (date), I served the foregoing document described
as:

10

11    _Preliminary Injunction_

12    _Complaint_

13

14

15    on all interested parties in this action by placing a true and correct copy thereof in a

16    sealed envelope, with first-class postage prepaid thereon, and deposited said

17    envelope in the United States mail in _Laguna Niguel, CA_, addressed
to:
              (city, state)

18

19    _Deutche Bank National Trust Co_(name)    _____ (name)

20    _(Dr. Josef Ackerman)_
    _60 Wall Street_ (address)    _____ (address)

21    _New York, New York 10005_ (address)    _____ (address)

22

23    I declare under penalty of perjury under the laws of the states of the United States

24    that the foregoing is true and correct.

25    Executed on _Oct 25 2010_ at _Laguna Niguel_.
              (date)              (place of signing)

26

27    _Diane Jenkins_ (signature)

28    _DIANE JENKINS_ (name)

# EXHIBIT A

Orange Coast Title
RECORDING REQUESTED BY

This Document was electronically recorded by
Orange Coast Title

AND WHEN RECORDED MAIL TO:
Juergen Kempff
25231 Del Rio
Laguna Niguel, CA  92677

Recorded in Official Records,County of Orange
Darlene Bloom, Interim Clerk Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ **8.00**
**20020298451** 03:45pm 04/09/02
103 51 G02 2
238.15 238.15 0.00 0.00 2.00 0.00 0.00 0.00

Space Above This Line for Recorder's Use Only

A.P.N.: _____          Order No.: _____     Escrow No.: **7001-LS**

# GRANT DEED

THE UNDERSIGNED GRANTOR(s) DECLARE(s) THAT DOCUMENTARY TRANSFER TAX IS: COUNTY $476.30
[ X ]  computed on full value of property conveyed, or
[    ]  computed on full value less value of liens or encumbrances remaining at time of sale,
[    ]  unincorporated area;  [ X ]  City of  Laguna Niguel , and

FOR A VALUABLE CONSIDERATION, Receipt of which is hereby acknowledged,
**Morris Z. Silver and Bea S. Silver, Husband and Wife**

hereby GRANT(S) to  **Juergen Kempff,**    a married man as his sole and separate property

the following described property in the City of **Laguna Niguel**, County of **Orange** State of California;

Lot  80  of Tract 4903, in the City of Laguna Niguel, County of Orange, California as per map recorded in Book 295,
Page(s) 45 to 48, Inclusive of Miscellaneous Maps in the Office of the County Recorder of said County.

_(signature)_                                                    _(signature)_
Morris Z. Silver                                            Bea S. Silver

Document Date:   March 4, 2002

STATE OF CALIFORNIA  Orange            )SS
COUNTY OF _____                 )
On___3-7-02_____  before me, JULIE A. RUDDOCKS
personally appeared   MORRIS Z. SILVER  &  BEA. S. SILVER ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to  the  within  instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their  signature(s)  on  the  instrument
the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _(signature)_

_(notary seal:)_
JULIE A. RUDDOCKS
COMM. # 1253921
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. FEB. 18, 2004

This area for official notarial seal.

Mail Tax Statements to:   SAME AS ABOVE  or  Address Noted Below

# Exhibit "A"

Lot(s) 80 of Tract No. 4903 in the city of Laguna Niguel county of Orange State of California as per map recorded in book 295, page(s) 45 to 48 Inclusive miscellaneous maps in the office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbons, below a depth of 500 feet, without the right of surface entry, as reserved in deeds of record.



**OFFICE OF THE ASSESSOR**
**WEBSTER J. GUILLORY**

**PROPERTY VALUE NOTICE**

P.O. Box 149
Santa Ana, CA 92702-0149
(714) 834-2727
Web Site: http://www.oc.ca.gov/assessor

Date: 07/12/02

Property Address:
25231 DEL RIO

637-155-09
SILVER, MORRIS Z
SILVER, BEA S
25231 DEL RIO
LAGUNA NIGUEL CA 92677-1517

**SECURED PROPERTY VALUATION**
**(THIS IS NOT A TAX BILL)**

The property referenced above has been reviewed by the Assessor Department for the 2002-2003 assessment year. Market conditions, comparable sales information and any new construction that occurred between January 1 and December 31, 2001 have been considered during our review.

The property tax bill you receive this fall will be based on the 2002-2003 Proposition 13 Factored Base Year Values listed below. Factored Base Year Values are based on the market value of your property when it was acquired, PLUS any new construction, PLUS an annual inflation factor of no more than 2% per year. Factored Base Year Values represent the maximum taxable values allowed under Proposition 13. The market value of this property is greater than the Factored Base Year Value.

| | 2002-2003 PROPOSITION 13 FACTORED BASE YEAR VALUES (TAXABLE VALUE) |
|---|---|
| Land | 105,528 |
| Improvements | 107,575 |
| Other Improvements | 0 |
| Personal Property | 0 |
| **Total Assessed Value** | **213,103** |
| Homeowner's Exemption | 7,000 |
| Net Assessed Value | 206,103 |

**PLEASE READ THE BACK OF THIS PAGE FOR MORE IMPORTANT INFORMATION**

| Percent Change From Last Year: 2.000% | Base Year: Land: 1982  Imps.: 1982 | Parcel No.: **637-155-09** |
|---|---|---|

Under certain circumstances your taxable value can increase by more than 2% per year



355717

WEBSTER J. GUILLORY
Orange County Assessor
P.O. Box 149, 630 N. Broadway Addition
Santa Ana, California 92702
Telephone (714) 834-2941

9045

DATE OF THIS NOTICE: 10/30/2002

OWNER'S NAME AND MAILING ADDRESS:

ASSESSOR'S PARCEL NUMBER (A.P.N.): 637-155-09
(IF PROP 60):
ADDRESS (situs):

KEMPFF, JUERGEN          (MS)          25231 DEL RIO LAGUNA NIGUEL
25231 DEL RIO
LAGUNA NIGUEL CA 92677

## NOTICE OF SUPPLEMENTAL ASSESSMENT

This supplemental assessment has been determined to be in accordance with the California Constitution, Article XIII-A requiring that real property be assessed at its full cash value in the event of a change in ownership or completion of new construction. A supplemental assessment covers changes in property value for the time period starting either when you (a) received ownership or (b) completed new construction and ending by January 1ˢᵗ (the lien date). For many years January 1ˢᵗ had been the last date to account for events that changed a property's taxable value on the annual assessment roll published in July each year. But since 1983, the law has directed that supplemental assessments be made for change in ownership and new construction events as they occur rather than waiting until January 1ˢᵗ. (Revenue and Taxation Code § 75.11/Senate Bill 813/1983 effective 7/1/83.) The pending tax bill resulting from this assessment is in addition to your regular secured roll assessment, and is your responsibility even if you have sold the referenced property.

**You have a Supplemental Assessment because of one or both of the following events:**

A. New construction completed on _____
   DATE

B. Change in Ownership effective on ___04/09/2002___   Recorder's Reference No.: R 02298451
   DATE

### SUPPLEMENTAL ASSESSMENT FOR CURRENT ROLL

|  | NEW BASE YEAR VALUE | 2001 ROLL VALUE | SUPPLEMENTAL ASSESSMENT |
|---|---|---|---|
| LAND: | 346,979 | 103,459 | 243,520 |
| IMPS: | 85,921 | 105,466 | -19,545 |
| EXEMPT/CODE: | 7,000 /07 | 7,000/07 | 0 |
| NET: | 425,900 | 201,925 | 223,975 |

### SUPPLEMENTAL ASSESSMENT FOR ROLL BEING PREPARED

|  | NEW BASE YEAR VALUE | 2002 ROLL VALUE | SUPPLEMENTAL ASSESSMENT |
|---|---|---|---|
| LAND: | 346,979 | 105,528 | 241,451 |
| IMPS: | 85,921 | 107,575 | -21,654 |
| EXEMPT/CODE: | 7,000/07 | 7,000/07 | 0 |
| NET: | 425,900 | 206,103 | 219,797 |

**EXEMPTION:** If we do not show a proper exemption for your property and if you are eligible, you may file a claim for such exemption with the Assessor's Office not later than the 30th calendar day following the date of this notice.

* March 1, if the event occured in 1996 or in prior years.

ASD111 (R 01/99)